## SECURITIES AND EXCHANGE COMMISSION v. STARMONT et al.
### No. 49.

District Court, E. D. Washington, N. D.
Nov. 18, 1939.

On the Merits Jan. 5, 1940.

James E. Newton, of Seattle, Wash., and Milton V. Freeman, of Washington, D. C., for plaintiff.

Wellman A. Clark, of Spokane, Wash., for defendants.

BLACK, District Judge.

There is before the Court this day a motion or application by the Securities and Exchange Commission, as plaintiff, for a preliminary injunction against Leon Starmont and Mining Truth Publishing Company, as defendants, to restrain or enjoin the defendants, their officers, agents, servants, employees and attorneys, from directly or indirectly making use of any means or instruments of transportation or communication in Interstate Commerce, or of the mails to sell any security in connection with the organization and operation of an enterprise designated by the defendants as "Assessable Exploration Company", or any other security thru the use or medium of any prospectus, or otherwise, or directly or indirectly carrying any such securities or causing them to be carried thru the mails, or in Interstate Commerce, by any means or instrument of transportation for the purpose of sale or delivery after sale unless and until registration statement is in effect.

Now, primarily the preliminary injunction is sought to prevent the defendants from using the mails or Interstate Commerce to advertise "Asexco", as the Assessable Exploration Company is known, in Mining Truth for the purpose of securing either subscriptions for the stock of this Company or signed statements by persons that they will accept shares of stock of this company and that they will or may accept units of this stock, and to advise such persons as to the assessment plan.

It is conceded that the corporation generally known as "Asexco" company is one that does not exist in fact. It has never been incorporated, it has no stock, no articles of incorporation, no officers and no assets. It is, likewise, conceded that there has been no registration of this corporation, nor any registration by promoters in connection with any pre-organization campaign. Nevertheless, it is the position of the plaintiff that the defendants are engaged in selling stock and in connection therewith are employing the United States mails in interstate commerce to facilitate such sale.

It is the position of the defendants that there is no corporation and no stock and that, prima facie, there can be no sale. Further, the defendants urge that even though it may be held that there could be stock sold in the corporation to be organized that they are neither selling nor endeavoring to sell stock and that likewise they are not soliciting commitments or subscriptions. The defendants contend that the original plan as set forth in Mining Truth might appear to the over-technical to constitute the solicitation of a sale; however, they say even then that there is no actual solicitation. The original paper to be signed by those who were interested in Assessable Exploration Company was carried as a part of Mining Truth and appears in the issue of August 18, 1939. The first page of this issue says: "Announcing the Assessable Exploration Company to be incorporated under the laws of the State of Nevada * * * A Hundred-for-one-shot! Assessments of 25¢ per day now may mean future dividends of $25.00 per day. (People who cannot afford to risk 25¢ per day should not buy stocks at all.) * * * Thousands of special awards for quick response or helpful cooperation. This is, despite the triteness of the phrase, The Opportunity of a Lifetime."

Then on the third page appears a paper to be signed by those interested, which is headed: "Subscription Blank * * * I inclose ——— dollars in payment for ——— $10.00 subscription(s) to the Mining Truth Advisory Service."

And, further—"Subject to receipt of a prospectus meeting the requirements of the Federal Securities Act of 1933, and the Mining Securities Act of the State of Washington—I will accept ——— unit(s) of 10,000 shares each of the Class A (assessable) stock of Assessable Exploration Company, plus as many of the Class B (non-assessable) shares as I may be entitled to receive under the terms on the inside and back pages of this subscription blank. * * * It is my understanding that each unit of 10,000 Class A shares will be assessable at the rate of $25.00 every four months, or $75.00 per year. I realize the inherently hazardous nature of the mineral industry, and you have my assurance that the number of units which I have agreed to accept does not represent an outlay greater than I can afford to risk."

There is some further information on this subscription blank and it is then prepared for signature and address. And, in the same paper are "Special Awards for Prompt Response", "Special Awards for Services to be rendered", "Special Awards

for Company Cooperation" and "The Only Other Awards of Class B Stock".

It is the further contention of the defendants that this method of advising the public of this corporation to be born was not and is not in violation of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. However, the defendants say that on the advice of counsel, to make it clear that they were merely inquiring as to what persons would or might be interested in such a corporation, if it were to be organized, that the issue of September 30, 1939, "un-made" any offering, if there was any offering. Mining Truth of September 30, 1939, on the front page uses this striking language: "Un-made 'Offering' is 'withdrawn'."

Then, instead of a subscription blank, issues a paper to be signed by the interested individual, entitled: "Indication of Possible Acceptance (This is not a subscription to anything)" This is addressed to Mining Truth and says: "I may accept ———— unit(s) of $10,000 shares each of the Class A (assessable) stock of Assessable Exploration Company, * * *" It goes on to recite the understanding of the assessability of the stock and appreciation of the inherent hazardous nature of the mineral industry. It again gives assurance that the seller can afford to risk the outlay indicated. And this does not contain in the "indication of possible acceptance" a subscription or subscriptions to Mining Truth. I am further advised that a green slip was enclosed in this issue providing for subscriptions to Mining Truth but reciting that a subscription to Mining Truth was not a requisite for interest in "Asexco".

The defendants contend that whatever arguments might have been made against the treatment of Asexco in the issue of August 18, 1939, that the treatment of September 30, 1939, can only be complained of by one who is "ultra imaginative and superlatively captious!" If that be true, the plaintiff in effect, pleads guilty to both indictments because plaintiff still insists that the issue of September 30 is a sale of security and is in violation of the Act.

I am rather of the opinion that the question presented to the Court is one of first impression. In other words, I do not believe that any other Court has passed upon this controversy, or one similar to it. At least no one has suggested to me that any other one than Mr. Starmont had ever conceived a similar plan. It is conceded that a predecessor of this plan, having many similarities, was created by Mr. Starmont in 1937 and christened "Submarine Gold Dredging Company". While there is some controversy between the parties to this action as to the legitimacy of that child, no Court was ever asked to pass upon the legitimacy, or determine the right of that child to have the benefits of the United States mail or Interstate Commerce. There have been some decisions that may be helpful in the charting of whatever course this Court should consider it is required to pursue in connection with this case. The Act, of course, must be depended upon for the decision. Necessarily, and in the final analysis, however, the issue of September 30, 1939, of Mining Truth will be the primary evidence that determines the question under the law as the Court interprets it.

The Securities Act of 1933 was passed, according to the first sentence of defendants' brief, "to protect the public by requiring publicity of all material facts and circumstances bearing on securities to be offered to the public". The position of the plaintiff is at least as strong as that, and I think I will accept that first sentence of the defendants' brief as being a fair preliminary statement.

 The Securities Act of 1933 describes "security" very much more broadly than had been the previous interpretation of that term. For instance, it means not only any note, stock, bond or debenture, but it means certificate of interest or participation in any profit-sharing agreement, trust certificate, pre-organization certificate or subscription, transferable share, investment contract, and many other things therein stated not necessary now to mention, except the Act further says it means in general any interest or instrument commonly known as a security, or any certificate of interest or participation in temporary or interim certificate, receipt for, guarantee of or warrant or right to subscribe in or purchase any of the foregoing. The Act defines "sale" and "sells", and "offer to sell", and "offer for sale", likewise more broadly than the lawyer or the layman previously thought or even imagined. The term "sale", for instance, or "sell", as well as "offer for sale" includes every contract for sale or disposition, or attempt or offer to dispose of, or solicitation of an offer to buy securities or interest in securities, except that such term shall not include preliminary negotia-

tions or agreements between issuer and an underwriter. In the very well-considered opinion of Judge Webster in this very Court almost two years ago, in an action between these same parties, it was pointed out that this statute was not a penal statute but was a remedial enactment.[1] A penal statute is one that punishes. It is to be strictly construed and is to be construed in favor of and not against the one who is brought into Court to answer to an alleged infraction. A remedial enactment is one that seeks to give a remedy for an ill. It is to be liberally construed so that its purpose may be realized. That is important for it means that these definitions of sale and of security are to be liberally construed. Their construction is to be at least as broad as the language of the Act. It goes without saying, therefore, that these shares of stock of Asexco would certainly be securities as soon as Asexco is organized. The law is well settled that when an exception is specifically mentioned that other things not mentioned are presumed not to be excepted. So ·when this language of definition says that "sell" shall not include preliminary negotiations or agreements between issuer and any underwriter and says no more, it, in effect, says that it does include and does apply to preliminary negotiations between an issuer and any one who is not an underwriter. Certainly those who read Mining Truth as subscribers or casually are not underwriters. If the defendants are engaged in the preliminary negotiations for the sale of the security they are violating this Act because the only preliminary negotiations they would have a right to make, unregistered, would be with the underwriter. The defendants urge something further than their interpretation of the law or their interpretation of the facts. The defendants say that this publication is entitled to the Constitutional rights of free press, and that defendants have a right to describe this proposed organization and its purpose, and in order to intelligently decide what to do they have the right to ascertain the attitude of those whom it approaches. I am inclined to think that the defendants are confronted with several dilemmas. If the issue of September 30, 1939, is not an offering for sale, if there was no commitment, if there was no subscription, if there was no payment, if there was no obligation there for any payment, then the defendants will lose nothing of material value if they are estopped from asking a person to tell them something that the person does not have to stay by. If, on the other hand, this is an ingenious subterfuge then, of course, the defendants should be prevented from indirectly offering to sell a security. If there is no corporation and if no one is bound to have a corporation then these readers of Mining Truth lose nothing because their expression of interest, according to this horn of the dilemma, is just merely the expression of an interest without any advantage. Likewise, according to defendants, there is no obligation on the part of Mining Truth or of Mr. Starmont. Unquestionably what previously had been designated a subscription blank is now printed "Indication of Possible Acceptance (This is not a subscription for anything)".

But, on page 6 of the same issue and which is a part of the same sheet on which this "Indication of Possible Acceptance" appears, is found these words:

"Special Awards for Services to be Rendered—For any person who mails ten acceptances (including his own) during the life of this offering—10,000 (Class B Shares)

"For any person who mails 25 acceptances (including his own) during the life of this offering, appointment as a member of the Advisory Committee, with traveling expenses not to exceed $100.00 to the first annual meeting of stockholders, plus—50,-000 (Class B Shares)"

Now, I am not convinced when they say it is an offering on page 6 that it is not an offering. Either the company is bound, either this defendant company is bound to give 10,000 Class B shares to whomever mails in ten acceptances, or they are not. If they are, it is an offering. If they are not bound to do it certainly the mass of the public is not going to be injured if the defendants are prevented under the claim of free press from making ·an offering that they are not obligated to fulfill.

It is also urged now that the $10 subscription is wholly divided from this search for public sentiment. But on page 6 we find:

"Special Awards for Prompt Response— For the first acceptance from each American state or territory, Canadian province or foreign country, by a present client of Mining Truth—10,000 (Class B Shares)

---

[1] No opinion for publication.

268

"For the first acceptance from each American state or territory, Canadian province or foreign country, by a former client of Mining Truth—7,500 (Class B Shares)"

Can it be urged that there will not be some who will pay $10 for Mining Truth to make them a present subscriber who are at least partly influenced by this proposition of 2,500 more shares than they would get if they had allowed their subscription to expire? That isn't all. It further says: "For the first acceptance from each American state or territory, Canadian province or foreign country, by a person who has not previously been on the Mining Truth client list—5,000 (Class B Shares)".

So while the $10 is only for subscription to Mining Truth a person will get 10,000 shares if he is a subscriber and 5,000 shares if he sends in evidence of his interest without the $10. And at this time I cannot temporarily escape at least the conclusion that that 5,000, that difference of 5,000 shares is an inducement for a sale of the security in this corporation which page 6 would seem to obligate this defendant corporation to organize. Because if I were to send in $10 and become a subscriber, wouldn't I have a right to say, "I am expecting you to live up to this promise? I didn't send this in merely to let you know I would like this stock, maybe. I hurried to send my $10.00 first of everyone so that I would get 10,000 shares of this corporation which the defendants are going to organize in the State of Nevada."

I am satisfied that the issue of September 30th is contrary to the liberal construction or interpretation that a remedial enactment is entitled to. But even if it, standing alone, should not be construed as contrary to the provisions of the Act I feel forced to construe it in the light of the previous issues. When the issue of August 18, 1939, described the Assessable Exploration Company as the "opportunity of a lifetime" certainly those who would sign the indication of possible acceptance on September 30th who had read the issue of August 18th would be doing it because they to some extent had been influenced to believe it was still "the opportunity of a lifetime". Taking the issues of August 18th and September 30th together it appears to me at this time on this preliminary application that the position of the plaintiff is well taken;

that the defendants are incorrectly seeking to evade the provisions of the statute by offering for sale a security as a part of the preliminary negotiations with some ones other than underwriters. I have no hesitancy at this time in issuing this preliminary injunction. The question before me is not so much whether or not Mining Truth has been fair with its readers. There is no question but that the readers of Mining Truth have been advised that this is very risky. They have been advised if they cannot afford to lose they should not invest. But if the issue of September 30th is legal someone else could eliminate that warning. And if Mining Truth can follow this plan then someone else can copy it and use it for an engine to defraud.

I appreciate that the argument of the defendants is that the Commission is becoming alarmed before anything is being sold; that no money is to be collected until the prospectus is issued, as provided by law, and until the corporation is organized and registered according to law. But this Act itself appreciates the importance of preliminary negotiations being free from falsity, and so the purpose of this remedial legislation is that the remedy shall be applied while it can be effective. There is no use to apply a remedy to protect the public after the public has been infected by the virus, and so long after it has been affected by the virus that the remedy will be of no avail.

I am also mindful of the position of the defendants as to the right of free press. I am not holding at all that these defendants cannot publish all the articles they wish extolling the virtues of an organization to help worried but financially distressed mining corporations. But it is an altogether different thing to give news or editorial expression to the desirability of having such a corporation than it is to say there is to be specifically a corporation, it is to be organized in the State of Nevada, its principal place of business is to be in a certain city in Washington, its operations are to be in the State of Oregon, it is to have shares of stock of one mill each of one class, and so much each of another class, its officers are to be designated in the initial period by Leon Starmont. The readers are to have the privilege not of expressing their opinion of the desirability of this type of corporation, but they are to have their opportunity of expressing their willingness or inclination only to accept

this particular type of stock, in this particular type of organization, dictated in advance by one individual. There isn't even an appeal in this issue for the views of the readers as to what they think the corporation should be. This isn't an article by the paper expressing its views and inviting the public or its readers to express their views. These articles do not ask for the readers to say what state they think this corporation should be in, how much stock they think it ought to have, where they think it ought to operate, where they think it ought to have its principal place of business, or who they think ought to name its directors.

The preliminary injunction will issue. I might say this, gentlemen: Unquestionably I have authority today to issue this injunction and sign it. Possibly I will have authority next week, I am not certain. I will be in this city until ten o'clock tonight. My designation of authority may give me authority for some considerable time, but I have it today. I would request that counsel submit to me the preliminary injunction before ten o'clock tonight. I will be here at such time as counsel think they will be available.

(Whereupon it was agreed that counsel should meet with the Court at 8 o'clock P. M.)

### On the Merits.

This matter has come on for trial today on the merits. The facts have been stipulated.

So far as I see the facts I find them the same now for all practical purposes as they were at the time of the hearing on the motion for temporary injunction. It is true that in the issue of October 31, 1939, "delayed", as shown by the affidavit of Mr. Starmont, there is added on page 6 thereof the word "proposed" to the term "offering" in connection with the special awards for any person who mails ten acceptances, including his own, but the next special award on page 6 continues to say it is available during the life of this offering and not during the life of any proposed offering.

During recess I have read the Act involved in this action, the written argument presented by the defendants, and the issues of Mining Truth of August 18, September 30, and October 31, 1939. I am satisfied with the conclusion stated in my opinion in connection with the hearing on the motion for temporary injunction. Counsel for defendants has said we should look at the substance and not the form. I am not particularly pleased with the form of some of the sentences in this opinion, but I am satisfied that the substance is correct. The Act involved, as pointed out at that time is not a penal act to be strictly construed but is a remedial law to be liberally construed and applied. It is entitled "AN ACT to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes". Under the broad language of the Act and giving it the liberal interpretation that it, as a remedial law, is entitled to receive I find that the defendants are issuers, as defined in the Act, of a security as defined in the Act, and that they are offering such for sale, under the language of the Act, thru the medium of the mails in interstate commerce. If it is intended by the defendants that the "Indication of Possible Acceptance" is not a subscription to anything, and if such persons who may sign such did not commit themselves at all by the language therein set forth, "I may accept —— units * * *", then the defendants will suffer no injury by the issuance of the injunction. If, on the other hand, this portion of Mining Truth entitled "Indication of Possible Acceptance" is intended to be something more than the literal language says, then it is a subterfuge designed to evade the provisions of the remedial law. As I stated before, I do not consider that an injunction in this proceeding deprives the defendants of any of the rights of a free press that the Constitution of the United States guarantees or contemplates. The defendants say in argument that they wish to ascertain the views and opinions of various people as to such project. I have examined the issues of Mining Truth carefully and find no where any request for the views and opinions of any persons. I find in the issue of August 18 a solicitation for persons to subscribe for so many issues of stock. Subsequently, the issues of Mining Truth solicit the public to say that they "may accept —— units", 10,000 shares each, of stock in a specific corporation. This Court is not saying in any way that a paper may not seek the views of its readers.

Permanent injunction will issue.